1  Rosemary M. Rivas (SBN 209147)
2  Rosanne L. Mah (SBN 242628)
   **GIBBS LAW GROUP LLP**
3  1111 Broadway, Suite 2100
   Oakland, California 94607
4  (510) 350-9700 (tel.)
   (510) 350-9701 (fax)
5  rmr@classlawgroup.com
   rlm@classlawgroup.com
6

7  *Attorneys for Plaintiff Hieu Vu*
8

9        **IN THE UNITED STATES DISTRICT COURT FOR THE**
                **SOUTHERN DISTRICT OF CALIFORNIA**
10

11
   HIEU VU, individually and on behalf of all        Case No. ___'24 CV1484 AGS VET___
12 others similarly situated,
13
                              Plaintiff,             **CLASS ACTION COMPLAINT**
14
                                                    **JURY TRIAL DEMANDED**
15 v.
16
   LPL FINANCIAL LLC,
17
18                            Defendant.
19
20
21
22
23
24
25
26
27
28

CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

I.   NATURE OF ACTION .......................................................................................1

II.  PARTIES ..........................................................................................................1

III. JURISDICTION AND VENUE .........................................................................2

IV.  FACTUAL ALLEGATIONS .............................................................................2

    A.   BACKGROUND ON CASH SWEEP ACCOUNTS ...........................2

    B.   DEFENDANT'S CASH SWEEP PROGRAM ...................................4

    C.   LPL'S DUTIES TO PLAINTIFF AND CLASS MEMBERS ...........8

        1.   Contractual Duties ...................................................................8

        2.   Duties Imposed on LPL by Law ................................................8

    D.   LPL BREACHED ITS LEGAL AND CONTRACTUAL DUTIES
        TO ITS CUSTOMERS ........................................................................9

    E.   PLAINTIFF'S EXPERIENCE ..........................................................11

V.   CLASS ACTION ALLEGATIONS ..................................................................11

VI.  CAUSES OF ACTION .....................................................................................14

PRAYER FOR RELIEF .............................................................................................19

DEMAND FOR JURY TRIAL ..................................................................................19

CLASS ACTION COMPLAINT

Plaintiff Hieu Vu, individually and on behalf of all others similarly situated, alleges the following based on his personal experience and his counsel's investigation:

## I. NATURE OF ACTION

1.     Plaintiff brings this proposed class action suit against Defendant LPL Financial LLC ("LPL") based on LPL's actions and conduct with respect to the cash sweep program it operates.

2.     LPL automatically transfers its customers' uninvested cash in what is known as a "cash sweep account" where their cash can earn interest. The cash sweep accounts at issue in this case are the LPL Deposit Cash Account ("DCA") and the LPL Insured Cash Account ("ICA") (collectively, "LPL Sweep Program"). Plaintiff and Class members are clients with LPL whose uninvested cash was automatically transferred into cash sweep accounts pursuant to the LPL Sweep Program.

3.     At all relevant times, LPL had a legal and contractual duty to act in the best interests of Plaintiff and the proposed Class members. Unfortunately for Plaintiff and Class members, LPL breached its legal and contractual duties to them. LPL automatically deposited Plaintiff and Class members' uninvested cash with banks (both affiliated and unaffiliated) that pay low and unreasonable rates of return to LPL's investment customers, but paid LPL significant and higher fees at the expense of customers. As a result, LPL was able to generate massive revenues while paying customers a pittance.

4.     Plaintiff alleges that LPL's conduct was unlawful, as described in further detail below, and alleges on behalf of himself and all others similarly situated claims for breach of fiduciary duty, breach of contract, gross negligence, breach of the implied covenant of good faith and fair dealing, and unjust enrichment. Plaintiff seeks all available monetary and equitable relief, including damages, disgorgement, restitution, and all other appropriate relief.

## II.     PARTIES

5.     Plaintiff Hieu Vu is a resident and citizen of Tustin, California.

CLASS ACTION COMPLAINT

6.     Defendant LPL is headquartered in San Diego, California and incorporated in Delaware. LPL is the largest, independent broker-dealer in the United States providing financial planning products and services, including wealth and asset management, among other things, and is the nation's largest independent broker-dealer.

### III.     JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which one or more members of the proposed Class, including Plaintiff, are citizens of a state different from Defendant. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

8.     This Court may exercise jurisdiction over Defendant because it is headquartered in this District; has sufficient minimum contacts in District; and intentionally avails itself of the markets within this District through the promotion, sale, and marketing of its services, thus rendering the exercise of jurisdiction by this Court proper and necessary.

9.     Venue is proper in this District under 28 U.S.C. § 1391 because Defendant resides in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims emanated from this District.

### IV.     FACTUAL ALLEGATIONS

#### A.     <u>Background on Cash Sweep Accounts</u>

10.     A "cash sweep" or "sweep" account is typically linked to a brokerage account and holds uninvested money, such as the initial cash deposits with LPL before the cash is invested in a security, or cash customers prefer to remain uninvested. The uninvested cash is "swept" into an interest-bearing account to ensure that the cash is not sitting idly not generating income.

11.     Today, cash sweep programs work by automatically "sweeping" uninvested cash each day into one or more banks that are usually affiliated with the brokerage firm. Historically, client uninvested cash sat with brokerage firms on their balance sheets, but in the 1960s, brokerage firms started depositing the cash with banks in the form of certificates of deposit. In early 2000, Merrill Lynch began offering the type of sweep accounts or programs that are available today and later other brokerage firms, like Charles Schwab, did the same.

12.     The Security and Exchanges Commission ("SEC") defines a sweep program as a "service provided by a broker or dealer where it offers to its customers the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product . . . or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." 17 C.F.R. 240.15c3-3(a)(17).

13.     The amount of uninvested client cash that brokerage firms hold is around $1 trillion dollars. It is estimated that LPL has about $23 billion of client cash in its advisory accounts.[1]

14.     Brokerage firms and affiliate banks earn significant net interest income (or "spread")—that is, the difference between the rate of interest earned by (1) custodians loaning and investing the sweep deposits, and (2) the interest paid to brokerage customers.

15.     The amounts that brokerage firms earn under sweep programs are based on their agreements with the affiliated banks. The agreements generally provide compensation based on the average daily deposits at the affiliated banks, and the total compensation is generally based on the Federal Funds rate plus basis points.

16.     For some time, Federal Fund rates—the interest rate at which banks lend each other money and which is set by the Federal Open Market Committee—were low and so it

---

[1] https://www.investmentnews.com/broker-dealers/news/higher-rates-on-cash-could-cost-lpl-380-million-analyst-255549#:~:text=%E2%80%9CHowever %2C%20to%20the%20 extent%20LPL, estimate%20from%20$19.75%20to%20$15.95. (last accessed August 20, 2024).

3

CLASS ACTION COMPLAINT

was expected that earned interest on cash sweeps would be low if not zero. But in 2022, however, the Federal Funds rate significantly increased as the following chart shows:

| YEAR | AVE. YIELD | YEAR HIGH | YEAR LOW | YEAR CLOSE | ANNUAL % CHANGE |
|------|-----------|-----------|----------|-----------|-----------------|
| 2024 | 5.33% | 5.33% | 5.33% | 5.33% | 0.00% |
| 2023 | 5.03% | 5.33% | 4.33% | 5.33% | 23.09% |
| 2022 | 1.68% | 4.33% | 0.08% | 4.33% | 6085.71% |

17. When the Federal Fund rate rose beginning in 2022, banks increased yields and so brokerages should have been able to negotiate higher rates of return on uninvested cash from affiliated banks. Unfortunately, that has not been the case with some firms such as LPL. Instead, LPL places sweep deposits with affiliated banks that it negotiates with to pay less than reasonable interest rates to customers and more money for itself.

18. The SEC has stepped up its investigations into brokerage cash sweep programs. For example, according to a Wells Fargo & Company filing in November 2023, the company disclosed that the SEC "has undertaken an investigation regarding the cash sweep options that the company provides to investment advisory clients at account opening." Morgan Stanley reported a similar investigation in a quarterly earnings report: "Since April 2024, the firm has been engaged with and is responding to requests for information from the Enforcement Division of the SEC regarding advisory account cash balances swept to affiliate bank deposit programs and compliance with the Investment Advisers Act of 1940[.]"

19. As described in Part C below, brokerage firms owe legal and contractual duties to act in the best interest of their customers, including with respect to their clients' uninvested cash holdings.

### B.  Defendant's Cash Sweep Program

20. By default, LPL assigns its customers to one of two different cash sweep programs based on the type of account the customer has. The first program is the LPL Deposit Cash Account ("DCA") for individual retirement accounts (IRAs) and the second

1    is the LPL Insured Cash Account ("ICA") for other individual, or business, accounts. LPL
2    automatically assigns customers to either a DCA or IRA account.

3        21.    Under the LPL Sweep Program, each business day uninvested cash balances
4    will automatically sweep into interest bearing deposit accounts set by LPL following the
5    day of deposit and with the banks selected by LPL. The banks that participate in these
6    programs are set forth on LPL's bank lists, which LPL may modify at any given time. The
7    lists include dozens of large financial institutions, like Citibank, Sallie Mae, and HSBC.

8        22.    The terms of each of the LPL sweep accounts are set forth in the in the
9    Deposit Cash Account Disclosure Booklet and the Insured Cash Disclosure Booklet ("Cash
10   Sweep Disclosures"), as well as the LPL Master – Account Agreement and Relationship
11   Summary (together "Brokerage Agreement").[2] The Brokerage Agreement provides that
12   uninvested cash balances in the LPL Sweep Program will have interest rates that are tiered
13   and that the amount paid is determined by the "amount the Banks are willing to pay on the
14   Deposit Accounts minus the fees paid to LPL and other parties . . . [.]"

15       23.    The deposit accounts in the LPL Sweep Program have historically had very
16   low rates of return. From 2022 through August 2024, the rate of return for LPL's DCA
17   accounts ranged from 0.16% to 0.35% today.

18       24.    As of August 9, 2024, the interest rates LPL paid to its ICA customers with LPL's
19   sweep program deposits ranged as follows:[3]

| Household Value | Rate |
|---|---|
| $0 to <$150k | 0.35% |
| $150k to <$300k | 0.40% |
| $300k to <$500k | 0.45% |
| $500k to <$750k | 0.50% |
| $750k to <$1.5m | 0.80% |

25   [2] https://www.lpl.com/content/dam/lpl-www/documents/disclosures/lpl_dca-disclosure-
26   booklet.pdf; https://www.lpl.com/content/dam/lpl-www/documents/disclosures/lpl_ica-
     disclosure-booklet.pdf; and https://www.lpl.com/content/dam/lpl-
27   www/documents/disclosures/AP-LPL.pdf (last accessed August 20, 2024).

28   [3] Rates available as of August 9, 2024, at https://www.lpl.com/content/dam/lpl-
     www/documents/disclosures/insured-cash-account-current-interest-rate-tiers.pdf.

CLASS ACTION COMPLAINT

| | |
|---|---|
| $1.5m to <$5m | 1.15% |
| $5m to <$10m | 1.25% |
| >$10m | 2.20% |

25.     Rates in 2022 for LPL's ICA customers ranged from 0.10% to 0.30%.

26.     While LPL customers have earned low rates of return on their uninvested case, in contrast, LPL has earned significant net interest income from its cash sweep program.

27.     For example, in it 2016 Annual Report, LPL reported that its asset-based revenue for the year ending December 31, 2016, had increased by $62.8 million from the same period the year before, and that most of that increase was attributable to its cash sweep programs.[4]

28.     By 2024, the profits the firm makes from holding clients' cash are now greater than the combined earnings from advisory fees, commissions, and interest combined.[5] In other words, to generate profits, LPL is uniquely dependent on net interest income from its cash sweep program.

29.     Analysts have estimated that raising rates could cost LPL around $380 million in spread interest.[6]

30.     LPL has been able to earn massive revenues because it places its interests above those of Plaintiff and Class members by depositing cash sweep deposits with affiliated banks that pay little interest to customers and pays larger fees and interest to itself and the affiliated banks. Moreover, LPL negotiated these arrangements with the affiliated banks. There are no provisions in the Brokerage Agreement, however, that allow LPL to place its financial interests above its customers' best interests in this manner.

---

[4]LPL 2016 Form 10-K Report at p. 47, available https://www.annualreports.com/HostedData/AnnualReportArchive/l/NASDAQ_LPLA_2016.pdf (last accessed August 9, 2024).
[5] LPL Q1 2024 Earnings Key Metrics Presentation at p. 11, available at https://www.lpl.com/content/dam/lpl-www/documents/lpl-financial-q1-2024-key-metrics-presentation.pdf (last accessed August 9, 2024).
[6] https://www.investmentnews.com/broker-dealers/news/higher-rates-on-cash-could-cost-lpl-380-million-analyst-255549#:~:text=%E2%80%9CHowever%2C%20to%20the%20extent%20LPL,estimate%20from%20$19.75%20to%20$15.95 (last accessed August 20, 2024).

31.     In April 2023, FinancialPlanning reported on conflicts of interests arising from cash sweep programs and posed the following questions to LPL and other brokerage firms:

 a.     In terms of percentage points or basis points, what are the latest available figures for the yields to clients from sweep accounts and the yields to the firm?

 b.     How would the firm explain this line of business to clients asking how it's in their best interest?

 c.     How can financial advisors using your firm's brokerage and/or custodial services make use of higher-yield cash solutions for their clients?

 d.     What else should financial advisors know about your firm's cash sweep accounts?

32.     LPL did not provide answers to FinancialPlanning or that could be publicly shared.

33.     While LPL customers received artificially and unreasonably low rates, LPL received a larger share of the spread at its customers' expense. Had LPL obtained reasonable rates for its customers like other brokerages, however, it would have earned less. LPL put its financial interests ahead of that of its customers instead and was able to handsomely line its pockets with massive revenues.

34.     In failing to obtain reasonable rates for its customers, LPL breached its contractual and fiduciary obligations to its customers, as alleged and described herein.

CLASS ACTION COMPLAINT

## C.    LPL's Duties to Plaintiff and Class Members

### 1.    Contractual Duties

35.    In operating its cash sweep program, LPL agreed to act as an agent on behalf of its advisory clients. The Brokerage Agreement states that, "As your agent, LPL will sweep cash out of your LPL Account and into the participating banks . . . [.]" Thus, in establishing the cash sweep program, LPL had to put the best interests of its customers first and deposit the uninvested balances in banks that paid reasonable interest rates.

36.    Moreover, LPL acknowledges in the Brokerage Agreement that it owes fiduciary duties to its customers:

> *When we provide you with a recommendation as your broker-dealer or act as your investment adviser,* **we have to act in your best interest and not put our interest ahead of yours**. (emphasis added)

37.    Additionally, Regulation Best Interest ("Reg. BI") governs the scope of LPL's relationship with Plaintiff and Class members. Reg. BI applies to retail investors, i.e., natural persons, or their legal representatives, who receive recommendations primarily for personal, family, or household purposes. 17 C.F.R. § 240.15l-1(b)(1).

38.    Pursuant to Reg. BI, in its role as a broker-dealer, LPL must act in its clients' best interests when it makes recommendations to them, "without placing the financial or other interest of the broker-dealer ahead of the interests of the retail customer[.]"

39.    As its customers' agent and pursuant to its contractual obligations, LPL must act in their best interests and not put its own personal gain ahead of its clients.

40.    In failing to negotiate higher and pay reasonable rates for its customers during the operation of its cash sweep program, LPL breached its contractual duties to customers.

### 2.    Duties Imposed on LPL by Law

41.    In acting as an investment adviser, LPL owes its clients a fiduciary duty under federal law. *See* Securities and Exchange Commission Interpretation Regarding Standards of Conduct for Investment Advisers, 84 Fed. Reg. 134, 17 CFR § 276 (July 12, 2019) ("Under federal law, an investment adviser is a fiduciary.").

42.     Pursuant to these regulations, LPL was obligated to "serve the best interest of its client and not subordinate its client's interests to its own." *Id.* And LPL cannot "place its own interests ahead of the interests of its client." *Id.*

43.     LPL must also use its skills and expertise for the benefit of its clients.

44.     LPL owes a similar duty of care to its retail clients pursuant Reg. BI, 17 C.F.R. § 240.15l-1. Again, LPL acknowledges in the Brokerage Agreement that the Reg. BI governs the scope of LPL's relationship with Plaintiff and Class members.

45.     Like SEC conduct rules, Reg. BI also requires LPL to "act in the retail customer's best interest and cannot place its own interests ahead of its customer's interests." 84 Fed. Reg. 33318, 33320.

46.     Reg. BI "draw[s] on key principles underlying fiduciary obligations, including those that apply to investment advisers under the Advisers Act, while providing specific requirements to address certain aspects of the relationships between broker-dealers and their retail clients." 84 Fed. Reg. 33318, 33320 (July 12, 2019).

47.     As described and alleged herein, LPL failed to abide by its fiduciary duties and failed to act in the best interest of its customers as set forth under federal law.

**D.      LPL Breached Its Legal and Contractual Duties to Its Customers**

48.     LPL breached its fiduciary and contractual duties by failing to negotiate higher and reasonable interest rates for its customers' uninvested cash in operating the LPL Sweep Program.

49.     Through its contractual and legal duties, LPL was obligated to act in the best interest of its clients consistent with the Brokerage Agreement. LPL's practice of extracting excessive fees from its customers' cash sweep deposits, through the negotiation of unreasonably low interest rates with affiliated banks, was against its customers' interests.

50.     LPL did not negotiate higher and reasonable rates of interest for its customers' cash sweep deposits, but instead it worked in consultation with its affiliated bank partners to set artificially and unreasonably low interest rates.

51.     The Department of Labor defined a "reasonable" rate of interest in 2003 and suggested one way of determining a "reasonable" rate is to refer to rates "offered by other banks" or by "money market funds."[7]

52.     Compared to its competitors, the LPL Sweep Program's interest rates are substantially lower than similar sweep products offered by other financial institutions.

53.     The rates of four of LPL's competitors are in the table below:

| LPL Competitor | Cash Sweep Interest Rate |
|---|---|
| **Interactive Brokers**[8] | 4.83% |
| **MooMoo**[9] | 5.1% |
| **Vanguard**[10] | 4.5% |
| **Webull**[11] | 5.0% |

54.     Not only are LPL's interest rates significantly lower than its competitors, but they are also substantially lower than interest rates for money market fund rates.

55.     Many of LPL's competitors offer programs that sweep uninvested cash into money market funds where their customers receive higher returns on their cash, while LPL eliminated use of money market funds as a cash sweep option for accounts eligible for its DCA and ICA cash sweep programs.

56.     For example, LPL competitor Fidelity offers a program that sweeps uninvested cash into money market funds that earn approximately 5%.[12] Vanguard's sweep program offers money market funds as an option as well, with yield rates also around 5%.[13]

---

[7] 68 Fed. Reg. 34646, at 34648 (June 10, 2003)

[8] https://www.interactivebrokers.com/en/accounts/fees/pricing-interest-rates.php (last accessed August 7, 2024).

[9] https://www.moomoo.com/us/invest/cashsweep (last accessed August 7, 2024).

[10] https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account (last accessed August 7, 2024).

[11] https://www.webull.com/cash-management (last accessed August 7, 2024).

[12] https://www.fidelity.com/go/manage-cash-rising-costs (last accessed August 20, 2024).

[13] https://investor.vanguard.com/accounts-plans/vanguard-cash-plus-account and https://investor.vanguard.com/investment-products/money-markets (last accessed August 20, 2024).

CLASS ACTION COMPLAINT

But LPL automatically places customers into the cash sweep programs it has developed with low yield rates that it negotiated with its affiliated banks.

57. According to one expert analyst, "LPL allocates uninvested client cash to third-party banks to generate higher yields than it pays out to clients through sweep accounts . . . Current sweep rates average around 0.85%, including under 0.80% for accounts with less than $1.5 million of assets. These rates are materially lower than yields on money market funds available to clients in the market."[14]

58. By negotiating significantly lower rates for the cash sweep programs it automatically placed Plaintiff and Class members in, LPL did not act in its customers best interests but put its own interests above theirs, making substantial net income revenue at its customers' expense.

### E. Plaintiff's Experience

59. Plaintiff Vu has an Investment Account and a Strategic Asset Management Account with LPL Financial and has been an LPL Financial customer since on or around 2021. Plaintiff Vu was enrolled automatically in LPL's Cash Sweep Program, and so for years his uninvested cash has been automatically swept into the affiliated banks that LPL selects in its discretion at rates ranging as low as 0.35%. LPL negotiated these low rates so that it could generate more profits for its benefit pursuant to the LPL Sweep Program.

### V. CLASS ACTION ALLEGATIONS

60. Plaintiff brings this action individually and on behalf of all other persons similarly situated (the "Nationwide Class") pursuant to the Federal Rule of Civil Procedure 23(b)(2), (b)(3), and (c)(4) initially defined as follows:

> All persons who had cash deposits or balances in the LPL Sweep Program.

61. The Nationwide Class is referred to herein as "Class."

62. Excluded from the proposed Class are Defendant, any entity in which Defendant has a controlling interest, is a parent or subsidiary, or which is controlled by

---

[14]https://www.investmentnews.com/broker-dealers/news/higher-rates-on-cash-could-cost-lpl-380-million-analyst-255549 (last accessed August 20, 2024).

CLASS ACTION COMPLAINT

Defendant, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendant; and judicial officers to whom this case is assigned and their immediate family members.

63.     Plaintiff reserves the right to re-define the Class definition after conducting discovery.

64.     **Numerosity (Fed. R. Civ. P. 23(a)(1))**. The Class members are so numerous that joinder of all members is impracticable. The precise number of Class members and their identities are unknown to Plaintiff currently. LPL is a financial services firm with over 22,000 financial advisors offering investment advising services nationwide. The parties will be able to identify Class members and the exact size of the Class through discovery and Defendant's records.

65.     **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3))**. Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Class. Questions common include, but are not limited to, the following:

    a.     Whether Defendant owed fiduciary duties to Plaintiff and Class members in the operation of the LPL Sweep Program;

    b.     Whether Defendant breached its fiduciary duties to Plaintiff and Class members in the operation of the LPL Sweep Program;

    c.     Whether Defendant breached the contract with Plaintiff and Class members in the operation of the LPL Sweep Program;

    d.     Whether Defendant's interest rates paid to Plaintiff and Class members were reasonable;

    e.     Whether the fees Defendant collected from the LPL Sweep Program were unreasonable;

    f.     Whether Defendant breached the implied covenant of good faith and fair dealing;

CLASS ACTION COMPLAINT

g. Whether Defendant is liable for gross negligence to Plaintiff and Class members in the operation of the LPL Sweep Program;

h. Whether Defendant was unjustly enriched because of the conduct complained of herein; and

i. Whether Plaintiff and Class members are entitled to relief, including damages and equitable relief.

66. **Typicality (Fed. R. Civ. P. 23(a)(3))**. Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the claims of the Class members. Plaintiff, like all Class members, was paid an unreasonably low interest rate in connection with the LPL Sweep Program. Accordingly, Plaintiff's claims are typical of other Class member's claims because they arise from the same course of conduct by Defendant, and the relief sought is common to Class members.

67. **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4))**. Pursuant to Rule 23(a)(4), Plaintiff and his counsel will fairly and adequately protect the interests of the Class. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the Class members. Plaintiff has retained counsel experienced in prosecuting class actions and breach of fiduciary cases.

68. **Superiority (Fed. R. Civ. P. 23(b)(3))**. Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class members because the amount of monetary relief available to individual plaintiffs is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

CLASS ACTION COMPLAINT

69. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may be properly maintained as a class action, because:

a. the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members which would establish incompatible standards of conduct for Defendant; or

b. the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to individual Class members which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c. Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

70. **Issue Certification (Fed. R. Civ. P. 23(c)(4))**. In the alternative, the common questions of fact and law, set forth in Paragraph 65, are appropriate for issue certification on behalf of the proposed Class.

## VI. CAUSES OF ACTION

### COUNT I
### BREACH OF FIDUCIARY DUTY

71. Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

72. Defendant owes fiduciary duties to Plaintiff and Class members arising out the Brokerage Agreement, and pursuant to Regulation Best Interest and 84 Fed. Reg. 134, 17 CFR § 276. Defendant's fiduciary duties arose out of Defendant's recommendations made to Plaintiff and Class members via automatic enrollment of Plaintiff and Class

members into the LPL Sweep Program and from Defendant's contractual obligation to serve as Plaintiff and Class members' agent under the Brokerage Agreement, including Defendant's holding and control over uninvested cash that belonged to its clients, such as Plaintiff and Class members.

73. In connection with the operation of the LPL Sweep Program and the governing Brokerage Agreement, Defendant owed duties to Plaintiff and Class members who had advisory, traditional and retirement brokerage accounts. Defendant's duties to Plaintiff and Class members, include, but are not limited to: (a) a duty of care to act in their best interests; (b) a duty to not place Defendant's interests above Plaintiff's and Class members; (c) a duty to use reasonable diligence, care, and skill when making recommendations; (d) a duty to avoid conflicts of interest; and (e) a duty to disclose conflicts of interests.

74. Defendant breached its duties to Plaintiff and Class members by, among other things: (a) failing to act in their best interests, which was to negotiate and pay a higher and reasonable interest rate on Plaintiff and Class members' cash balances; (b) placing its own interests ahead of Plaintiff and Class members' interests by securing increased net interest income for itself at the expense of Plaintiff and Class members; (c) failing to use reasonable diligence, care, and skill when operating the LPL Sweep Program; (d) failing to avoid or sufficiently mitigate conflicts of interests; and (e) failing to disclose Defendant's conflict of interest.

75. As a direct and proximate result of Defendant's misconduct as alleged herein, Plaintiff and Class members suffered damages in that they did not earn higher and reasonable rates of interests in amounts to be determined at trial. Plaintiff seeks damages, disgorgement of any undue and unjust gains of Defendant, punitive damages, as well as all other equitable relief deemed just and proper.

76. Defendant's conduct also warrants a punitive damage award because Defendant is guilty of oppression and engaged in conduct that is outrageous and exhibited reckless indifference to the rights of its clients, including Plaintiff and Class members.

CLASS ACTION COMPLAINT

## COUNT II
## GROSS NEGLIGENCE

77.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

78.     Defendant owed Plaintiff and Class members the duty to exercise reasonable diligence, care, and skill in recommending the LPL Sweep Program.

79.     Defendant breached their duties by failing to act in the best interests of Plaintiff and Class members, including by not negotiating and paying the available reasonable interest rates on the cash balances in their clients' accounts; and by placing their own interests ahead of Plaintiffs' and Class members' interests by securing increased net interest income at the expense of their clients.

80.     Defendant's conduct as alleged in this Complaint was grossly negligent because their self-serving conduct demonstrates a complete lack of care and reckless disregard for their clients' interests. Defendant's conduct also demonstrates an extreme departure from the ordinary standard of care.

81.     Defendant's gross negligence directly and proximately caused harm to Plaintiff and the Class members. As a result, Plaintiff and Class members suffered damages in an amount to be determined at trial.

## COUNT III
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

82.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

83.     Under California common law, a covenant of good faith and fair dealing is implied into every contract.

84.     Plaintiff and Class members contracted with Defendant to provide them with financial and/or investment services pursuant to the Brokerage Agreement.  Under the Brokerage Agreement, Defendant was an agent of Plaintiff and Class members and owed

CLASS ACTION COMPLAINT

them fiduciary duties, including to act in their best interests. Defendant failed to obtain for Plaintiff and Class members higher and reasonable rates of return on their cash balances and instead acted in its own interests. Moreover, under the Broker Agreement, as broker-dealers, and pursuant to Reg. BI and 84 Fed. Reg. 134, 17 CFR § 276, Defendant had a duty to act in the best interests of Plaintiff and Class members and not put its interests above Plaintiff and Class members.

85.     These contracts were subject to implied covenants of good faith and fair dealing that all parties would act in good faith and with reasonable efforts to perform their contractual duties (both explicit and implied) and not to impair the rights of other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the covenants that Defendant would act fairly and in good faith in carrying out their contractual obligations to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances.

86.     Defendant breached these implied covenants of good faith and fair dealing by failing to provide Plaintiff and Class member with fair and reasonable rates of return on their cash sweep balances. Defendant, instead of providing fair and reasonable rates of return on their clients' cash sweep balances, provided far below market rates of return that their clients could have otherwise earned on their cash. Defendant acted dishonestly and failed to exercise its discretion reasonably in selecting the banks which would hold Plaintiff and Class members' cash balances and in failing to negotiate reasonable rates of interest but instead negotiated higher rates of interest and fees for itself.

87.     Plaintiff and Class members fulfilled all the terms and obligations of their contract, including paying for Defendant's services.

88.     Defendant's failure to act in good faith in providing fair and reasonable rates of return on their customers' cash sweep balances denied Plaintiff and Class members the full benefit of their bargain. Plaintiff and Class members received a minimal return on their cash sweep balances that were less than what they could have otherwise earned and less than their reasonable expectations under their contract with Defendant.

89.     As a result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff and Class members sustained damages in an amount to be determined by this Court, including interest on all liquidated sums.

## COUNT IV
## BREACH OF CONTRACT

90.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

91.     Plaintiff and Class members entered into the Broker Agreement, whereby Defendant is obligated to provide Plaintiff and Class members with financial services, including a contractual obligation to negotiate for Plaintiff and Class members rates of return on their cash balances that are reasonable and to otherwise act in the best interest of the clients in the operation of the LPL Sweep Program.

92.     Pursuant to the Broker Agreement, Defendant was and continues to be contractually obligated to obtain for Plaintiff and Class members rates of return on their cash sweep balances that are reasonable and to otherwise act in the best interests of the clients in the operation of the LPL Sweep Program.

93.     As alleged herein, the rates of return paid to Plaintiff and Class members on their cash sweep balances were not fair and reasonable, and neither were the increased interest payments and fees that Defendant extracted for itself when negotiating with the affiliated banks. As a result, Defendant breached the contract with Plaintiff and Class members.

94.     Accordingly, Plaintiffs and Class members were harmed by Defendant's breach; and sustained damages in an amount to be determined at trial.

## COUNT V
## UNJUST ENRICHMENT

95.     Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

CLASS ACTION COMPLAINT

96.    Because of Defendant's wrongful conduct as alleged herein, Plaintiff and Class members received lower interest payments on their cash sweep balances than they would have in a reasonable and fair market.

97.    Because of Defendant's wrongful conduct as alleged herein, Defendant unjustly received a benefit at the expense of Plaintiff and Class members in the form of increased interest income that belonged to Plaintiff and Class members.

98.    It would be unjust and inequitable to allow Defendant to retain these wrongfully obtained benefits.

99.    Plaintiff and Class members are entitled to restitution and disgorgement of the benefits unjustly obtained, plus interest, in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the members of the Class defined above, respectfully request that this Court enter:

(a) An order certifying this case as a class action under Federal Rule of Civil Procedure 23, appointing Plaintiff as the Class representative, and appointing the undersigned as Class counsel;

(b) A judgment awarding Plaintiff and Class members appropriate monetary relief, including actual damages, equitable relief, restitution, and disgorgement;

(c) An order entering injunctive and declaratory relief as appropriate under the applicable law;

(d) An order awarding Plaintiff and the Class pre-judgment and/or post-judgment interest as prescribed by law;

(e) An order awarding reasonable attorneys' fees and costs as permitted by law; and

(f) All other and further relief as may be just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial.

Dated: August 20, 2024                          **GIBBS LAW GROUP LLP**

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*/s/ Rosanne L. Mah*
Rosemary M. Rivas
Rosanne L. Mah
1111 Broadway, Suite 2100
Oakland, California 94607
(510) 350-9700 (tel.)
(510) 350-9701 (fax)
rmr@classlawgroup.com
rlm@classlawgroup.com

*Attorneys for Plaintiff Hieu Vu*

CLASS ACTION COMPLAINT